UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MICHAEL P. GALIAN,
    Plaintiff,

v.

OFFICER SELWYN SEBOURNE, ET AL.
    Defendants.

No. 3:16-cv-01513 (MPS)

**RULING ON MOTION FOR SUMMARY JUDGMENT**

**I.    Introduction**

This action arises from the arrest of Plaintiff Michael Galian by Defendants Selwyn Sebourne and Michael B. McClain, both Shelton police officers. The plaintiff alleges that Officer Sebourne instructed officers of a neighboring police department to arrest the plaintiff without a warrant on a charge of breach of peace. He contends that Officer Sebourne took these actions despite his knowledge that the plaintiff was innocent of this charge. Further, he avers that Officer McClain assisted Officer Sebourne in carrying out this unlawful scheme. Based upon these allegations, the plaintiff sets out a claim of false arrest against both defendants and a claim of malicious prosecution against Officer Sebourne. Now before me is the defendants' motion for summary judgment. (ECF No. 27.) In their motion, the defendants contend that the plaintiff's claims fail because, among other things, Officer Sebourne had probable cause to arrest the plaintiff for breach of peace. For the reasons that follow, the defendant's summary judgment motion is granted.

**II.    Background**

    **A.    Factual Background**

1

The following facts, which are taken from the parties' Local Rule 56(a) Statements and the exhibits, are undisputed unless otherwise indicated. At the time of his arrest, the plaintiff resided in "Monroe, Connecticut, with his son, Brian Galian, and his son's girlfriend, Amanda Ely ('Ely')." (ECF No. 27-2, Defendants' Local Rule 56(a)1 Statement ("Def.'s L.R. 56(a)1 Stmt.") at ¶ 1; ECF No. 28-1, Plaintiff's Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2 Stmt.") at ¶ 1.) At all relevant times, the defendants were acting in their "capacities as police officers in the Shelton Police Department ('SPD')." (Def.'s L.R. 56(a)1 Stmt. at ¶ 2; Pl.'s L.R. 56(a)2 Stmt. at ¶ 2.)

"On February 13, 2015, Ely pled guilty to two felony drug charges . . . ." (Def.'s L.R. 56(a)1 Stmt. at ¶ 3; Pl.'s L.R. 56(a)2 Stmt. at ¶ 3.) An order was subsequently issued in a "separate pending custody dispute between Ely and Dwayne Anderson, Sr., which awarded the latter full legal custody of their minor son." (Def.'s L.R. 56(a)1 Stmt. at ¶ 4; Pl.'s L.R. 56(a)2 Stmt. at ¶ 4.) The parties dispute the exact wording of that order. The defendants contend that the order provided that "Ely was allowed supervised visitation . . . on [specific] weekdays between 3:30 p.m. and 7:00 p.m. during the school year, including the date [at issue in this case], September 8, 2015 (Def.'s L.R. 56(a)1 Stmt. at ¶ 5); the plaintiff contends that the "order during the school year provided that Ms. Ely's visitation during school days began at the time the child was dropped off at the bus stop, regardless of the specific time." (Pl.'s L.R. 56(a)1 Stmt. at ¶ 5.) This dispute between the parties would prove key in the events leading to the plaintiff's arrest, although it is not a dispute over a material fact for purposes of summary judgment.

"[B]eginning in March, 2015, and up to and including September 8, 2015, plaintiff had been granted permission by the minor son's guardian ad litem to supervise Ely's visits [with] him." (Def.'s L.R. 56(a)1 Stmt. at ¶ 6; Pl.'s L.R. 56(a)2 Stmt. at ¶ 6.) "On September 8, 2015,

plaintiff, who was acting as the court-assigned supervisor of Ely's visits with her minor son, drove Ely to the Anderson residence . . . in Shelton to pick him up." (Def.'s L.R. 56(a)1 Stmt. at ¶ 7; Pl.'s L.R. 56(a)2 Stmt. at ¶ 7.) The minor son's school had let him out early due to excessive heat. (*See* ECF No. 27-4, Deposition of Michael Galian ("Galian Depo.") at 33 ("So, on this particular day, . . . school was cancelled because it was just too darned hot to be in school.").) The plaintiff "pulled his vehicle up in front of the Anderson residence at approximately 1:00 p.m. on September 8, 2015; at that point, Ely exited the backseat and walked up Anderson's driveway, where she encountered Leanne Anderson, who was holding her three-year old daughter." (Def.'s L.R. 56(a)1 Stmt. at ¶ 8; Pl.'s L.R. 56(a)2 Stmt. at ¶ 8.) Ely and Ms. Anderson "engaged in [an] . . . exchange of words, after which Ely walked down the driveway, past plaintiff's vehicle, and across Longmeadow Street; she stopped and stood in front of [the house next to the Anderson residence], the location where her minor son was dropped off by his school bus on school days." (Def.'s L.R. 56(a)1 Stmt. at ¶ 9; Pl.'s L.R. 56(a)2 Stmt. at ¶ 9.) The dispute between Ely and Ms. Anderson mirrored the parties' dispute over the court order above—Ely felt the court order allowed her to pick up her minor son whenever school let out while Anderson felt that Ely's visitation began at 3:30 P.M. (*See* Galian Depo. at 33-34.)

The parties differ on what happened next. The defendants contend that "Leanne Anderson then approached plaintiff's vehicle and the two of them had a heated exchange, the specific tone and language of which is disputed by plaintiff and Ms. Anderson" (Def.'s L.R. 56(a)1 Stmt. at ¶ 10); the plaintiff contends that "Ms. Anderson was screaming hysterically at the plaintiff, but the plaintiff did not raise his voice to her and did not use any inappropriate language." (Pl.'s L.R. 56(a)2 Stmt. at ¶ 10.) "Shortly thereafter, the school bus pulled in front of [the house next to the Anderson residence], at which point Ely took her minor son of[f] the bus

3

and the two of them entered plaintiff's vehicle without interference from Ms. Anderson; plaintiff then drove his vehicle away from the scene." (Def.'s L.R. 56(a)1 Stmt. at ¶ 12; Pl.'s L.R. 56(a)2 Stmt. at ¶ 12.)

"After plaintiff drove off with Ely and her minor son in his vehicle," Ms. Anderson called the Shelton Police Department and "Officer Sebourne was dispatched to [the Anderson residence]." (Def.'s L.R. 56(a)1 Stmt. at ¶ 13; Pl.'s L.R. 56(a)2 Stmt. at ¶ 13.)[1] The parties' accounts diverge again on what took place next. The defendants contend that upon Officer Sebourne's arrival at the Anderson residence, he "proceed[ed] to interview and obtain[] a sworn statement from Leanne Anderson regarding her encounter with Ely and plaintiff prior to his arrival." (Def.'s L.R. 56(a)1 Stmt. at ¶ 14.) The plaintiff contends that "[t]he evidence shows that defendant Sebourne arrived at the Anderson house after the others involved had departed and that he wrote out a statement which he had Ms. Anderson sign." (Pl.'s L.R. 56(a)1 Stmt. at ¶ 14.) Although the plaintiff "disputes certain assertions made by Ms. Anderson in her statement, [he] does not dispute that she made them or signed the statement in front of Officer Sebourne" and he does not contest that the copy of the statement in the record is accurate. (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 15-16; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 15-16.)

In her statement, Ms. Anderson alleged that she walked over to speak with the plaintiff because he was "the mediator and should have his own copy of the custody agreement." (*See* ECF No. 27-6, Statement of Leanne Anderson ("Anderson Stmt.") at 2.) She claims in her statement that she "asked what [the plaintiff] was doing here, because the court paperwork clearly states to resume previous [visitation] hours of 3:30pm-7pm when [Ely's minor child] was

---

[1] Plaintiff expressly denies only that Officer Sebourne was dispatched "in response to a request by Ms. Anderson." (Pl.'s L.R. 56(a)2 Stmt. at ¶ 13.)

4

back in school." (*Id.*) According to Ms. Anderson's statement, the plaintiff's "response was 'I don't know shit.'" (*Id.*) She claims that she "then asked why he was talking to [her] like that since we never had a conversation before." (*Id.*) She claims that she then stated that she "wasn't sure exactly what was going on here and that's when [the plaintiff's] tone of voice escalated and he replied with, 'well if you don't know anything then you need to get the fuck back in your house.'" (*Id.*) Ms. Anderson's statement notes that "[a]t this point [she] took a step back from the car" and became "fearful." (*Id.*) According to her statement, she let the plaintiff and Ely take the minor child away when he arrived on the bus "because [Ms. Anderson] had no idea what they were capable of." (*Id.*) Ms. Anderson's statement ends with the claim that she "then called the police" and informed them that she wished to "pursue criminal charges against [the plaintiff]." (*Id.*)

After taking Ms. Anderson's statement, the defendants claim that Officer Sebourne "interviewed and took a sworn statement from her neighbor, Cynthia Formato, who lived across the street . . ., and [who] was waiting for two children to get off the bus during Ms. Anderson's encounter with Ely and plaintiff." (Def.'s L.R. 56(a)1 Stmt. at ¶ 21.) The plaintiff claims that Officer Sebourne "wrote out a statement which Ms. Formato signed." (Pl.'s L.R. 56(a)2 Stmt. at ¶ 21.) The plaintiff does not dispute, however, that "Ms. Formato provided Officer Sebourne with the sworn statement . . . ." (Def.'s L.R. 56(a)1 Stmt. at ¶ 23; Pl.'s L.R. 56(a)2 Stmt. at ¶ 23.) Nor does he dispute the accuracy of the copy of that statement in the record. (*See* Def.'s L.R. 56(a)1 Stmt. at ¶ 22; Pl.'s L.R. 56(a)2 Stmt. at ¶ 22.) Ms. Formato's statement reads as follows:

> I, Cynthia Formato am sitting here in my kitchen at [my home] in Shelton with Officer Sebourne. I am making this statement under my own free will and have not be[en] coerced in any way. On Tuesday, September 8, 2015, I was sitting on my front porch at approximately 12:55 waiting for my two sons to get off the bus. It

5

> was an early dismissal day due to heat.  I observed my neighbor Leanne getting upset.  She was telling [Ely] that she didn't belong there—Amanda walked towards my house and stood at the end of the driveway.  I then heard Leanne plead with whomever was in the vehicle to do the right thing for the child.  This is not direct quote, but she said something like, "Don't you want to keep him safe?"  I don't know what else was said.  I heard loud voices but couldn't make out the words.  Then I heard Leanne ask that the car be moved away from her home.  They pulled the car up to the next house.  The bus arrived.  I felt a bit stressed and nervous.  I was unaware of what could transpire so I took my children and one of their friends in the house immediately.  This is a true account of what I observed.

(ECF No. 27-2, Statement of Cynthia Formato ("Formato Stmt.") at 1-2.)  "Based on the information and conduct reported and sworn to by Ms. Anderson and Ms. Formato, Officer Sebourne concluded that there was probable cause to arrest plaintiff for breach of peace in violation of General Statutes § 53a-181."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 24; Pl.'s L.R. 56(a)2 Stmt. at ¶ 24 (noting that defendant makes this claim).)  Officer Sebourne then "radioed and asked his dispatcher to contact the Monroe Police Department and request that they send officers to plaintiff's residence to check on the welfare of Ely's minor son, and take plaintiff into custody for Breach of Peace."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 25; Pl.'s L.R. 56(a)2 Stmt. at ¶ 25.)  "Officer Sebourne did not observe, speak to or interact with plaintiff on September 8, 2015, and has never done so on any other date."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 26; Pl.'s L.R. 56(a)2 Stmt. at ¶ 26.)  Officer Sebourne's subsequent report of the incident notes that Ms. Anderson and Ms. Formato made the statements in question.  (*See* ECF No. 27-8, Ex. E ("Police Report") at 2-3.)

"Based on Officer Sebourne's investigation, probable cause determination, and request, Monroe police officers responded to plaintiff's residence on September 8, 2015 . . . and took plaintiff into custody for Breach of Peace."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 29; Pl.'s L.R. 56(a)2 Stmt. at ¶ 29.)  "A Monroe police officer then transported plaintiff from his residence to the parking lot of White Hills Shopping Center in Shelton."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 30; Pl.'s L.R. 56(a)2 Stmt. at ¶ 30.)  "On September 8, 2015, Officer McClain was assigned and

dispatched to: (1) meet Monroe Police at the White Hills Shopping Center in Shelton; (2) take custody of plaintiff; (3) transport plaintiff to the [Shelton Police Department]; and (4) charge and process plaintiff for Breach of Peace, in violation of General Statutes § 53a-181." (Def.'s L.R. 56(a)1 Stmt. at ¶ 31; Pl.'s L.R. 56(a)2 Stmt. at ¶ 31.) Officer McClain then completed these tasks. (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 32-33; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 32-33.) "After plaintiff was booked and processed, Officer McClain advised him that Officer Sebourne was the arresting officer for purposes of the Breach of Peace charge. This was the only interaction plaintiff has ever had with Officer McClain." (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 34-35; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 34-35.)

"At some point after September 8, 2015, Officer Sebourne was subpoenaed to and did appear in Derby Superior Court on one occasion in connection with the prosecution of the plaintiff's subject Breach of Peace charge; however, he was not asked to and did not testify at that time . . . ." (Def.'s L.R. 56(a)1 Stmt. at ¶ 39; Pl.'s L.R. 56(a)2 Stmt. at ¶ 39.) "After his arrest on September 8, 2015, plaintiff was no longer authorized to supervise Ely's visitation with her minor son." (Def.'s L.R. 56(a)1 Stmt. at ¶ 40; Pl.'s L.R. 56(a)2 Stmt. at ¶ 40.) The plaintiff was ultimately found not guilty of the Breach of Peace charge after a trial. (Galian Depo. at 92-93.)

  **B. Plaintiff's Complaint**

The plaintiff subsequently filed suit against Officers Sebourne and McClain. (*See* ECF No. 1 ("Complaint") at 1.) The plaintiff claims that Officer Sebourne instructed the Monroe Police Department to arrest plaintiff on a charge of breach of peace despite Officer Sebourne's knowledge that the plaintiff was innocent of such a charge. (Complaint at ¶ 7.) Defendant Sebourne took these actions, according to the plaintiff's complaint, "solely to curry favor with a

7

fellow Shelton Police Officer, Michael Curran, who had a personal vendetta against a member of the plaintiff's family." (*Id.*) The plaintiff alleges that as a result of Officer Sebourne's spurious allegations, "officers of the Monroe Police Department took [him] into custody at his home in Monroe and held him in custody until the defendant McClain, acting in conspiracy with defendant Sebourne, arrived at Monroe police headquarters and took custody of plaintiff." (*Id.* at ¶ 8.) After this, the plaintiff contends, Officer Sebourne "prepared a false and malicious police report which he submitted to the prosecuting attorney in the Connecticut Superior Court at Derby, for the purpose of causing the plaintiff to be prosecuted for a crime the defendants knew the plaintiff had not committed." (*Id.* at ¶ 10.)

Based upon these allegations, the plaintiff claims that "the defendants falsely arrested the plaintiff without a warrant and without probable cause, and in the absence of any extenuating circumstances that would have justified or excused their failure to obtain a warrant, and the defendant Sebourne maliciously prosecuted the plaintiff, all in violation of the Fourth Amendment to the United States Constitution as enforced through Sections 1983 and 1988 of Title 42 of the United States Code." (*Id.* at ¶ 13.)

### III. Legal Standard

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014) (internal quotation marks omitted). "A fact is material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). The moving party bears the

8

burden "of showing that no genuine factual dispute exists . . . , and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences" in favor of the non-moving party. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).

## IV. Discussion

### A. False Arrest Claim

The Fourth Amendment "prohibits unreasonable seizures in the form of arrests without probable cause." *Frederique v. Cty. of Nassau*, 168 F. Supp. 3d 455, 475 (E.D.N.Y. 2016); *see also Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) ("[A] § 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause."). "To establish a claim for false arrest under 42 U.S.C. § 1983, a plaintiff must show that 'the defendant intentionally confined him without his consent and without justification.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Weyant v. Okst.*, 101 F.3d 845, 852 (2d Cir. 1996)). A showing of probable cause will defeat a claim for false arrest. *See id.*

"In analyzing § 1983 claims for unconstitutional false arrest, [courts] have generally looked to the law of the state in which the arrest occurred." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (quoting *Weyant*, 101 F.3d at 852). Under Connecticut law, a plaintiff advancing a false arrest claim bears the burden of proving the absence of probable cause. *See Pearson v. Lorancaitis*, No. 3:09CV1641 VLB, 2012 WL 162355, at *3 (D. Conn. Jan. 19, 2012) ("Connecticut law places the burden on the false arrest plaintiff to prove the absence of probable cause."). "Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of

9

reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera*, 361 F.at 743 (internal quotation marks omitted). Further, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Pearson*, 2012 WL 162355 at *4 (quoting *Jaegly*, 439 F.3d at 154). Since the defendants have also alleged that they are entitled to qualified immunity on this claim (*see* ECF No. 27-1 at 21), they "need only show 'arguable' probable cause" to defeat the plaintiff's claims. *See Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (quoting *Lee v. Sandberg*, 136 F.3d 94, 103 (2d Cir. 1997)). "Whether probable cause existed is a question that may be resolved as a matter of law on a motion for summary judgment if there is no dispute with regard to the pertinent events and knowledge of the officer." *Winstock v. Wilk*, 296 F. Supp. 2d 241, 256 (D. Conn. 2003) (citing *Weyant*, 101 F.3d at 852.)

  Although the parties dispute various details pertinent to this dispute, they agree on a number of key facts. Most importantly, they are in agreement that Ms. Anderson provided a sworn statement to Officer Sebourne indicating that the plaintiff swore at her in an "escalated" "tone of voice" and caused her to become fearful, and that Ms. Formato provided a sworn statement to Officer Sebourne indicating that she "heard loud voices" during a discussion between Ms. Anderson and a person "inside the vehicle," and she "felt a bit stressed and nervous" about what she observed. (*See* Def.'s L.R. 56(a)1 Stmt. at ¶ 16 ("Plaintiff disputes certain assertions made by Ms. Anderson in her statement, but does not dispute that she made them or signed the statement in front of Officer Sebourne."); Pl.'s L.R. 56(a)2 Stmt. at ¶ 16 (admitting this fact); Galian Depo. at 129-30 (Q: "I'm asking you these are sworn statements

signed by witnesses [Leanne] Anderson and Cynthia Formato?" A: "Right." Q: "You have no reason to dispute that's what these are?" A: "No." Q: "Whether you agree with their content, you don't dispute the fact that they were written and signed?" A: "As I mentioned before, from reading the onset of it, it sounds like they were being coached by the same third person." Q: "But you weren't there when these individuals . . . signed and swore to the truth of these statements?" A: "No." ).) This decides the matter, as the plaintiff concedes that there is no genuine dispute of material fact that Ms. Anderson and Ms. Formato signed the statements attributed to them.

The plaintiff claims in his Local Rule 56(a)2 Statement that "[t]he evidence shows that defendant Sebourne . . . wrote out a statement which he had Ms. Anderson sign," (Pl.'s L.R. 56(a)2 Stmt. at ¶ 14.), and that it "sounds like [Ms. Formato and Ms. Anderson] were being coached by the same third person," presumably Officer Sebourne, when they wrote their statements. (Galian Depo. at 130.) The sole basis for this accusation appears to be the plaintiff's belief that the handwriting in Ms. Anderson's and Ms. Sebourne's sworn statements is similar. (*See* ECF No. 28 at 3 n. 1 ("Comparison of [Ms. Anderson's statement] and [Ms. Formato's statement] reveals that obviously both were written by the same person and the handwriting on neither of them matches that of the signatures. Thus it is obvious that defendant Sebourne wrote both statements.").) The plaintiff does not provide any evidence to support this assertion.[2] Further, as noted above, the plaintiff testified that he had no reason to dispute that Ms. Anderson and Ms. Formato provided Officer Sebourne with the statements. (*See* Galian Depo. at 90, 129-

---

[2] It is worth noting that the handwriting in Ms. Anderson's statement appears to be quite different from the handwriting in Ms. Formato's statement, but I do not rely on this observation. (*Compare* Anderson Stmt. *with* Formato Stmt.)

30.) I therefore conclude that the plaintiff has failed to raise a genuine issue of material fact on the issue.

The question then becomes whether Ms. Anderson's and Ms. Formato's statements provided Officer Sebourne with "knowledge or reasonably trustworthy information of facts and circumstances . . . sufficient to warrant a person of reasonable caution in the belief that the person to be arrested ha[d] . . . commit[ed] a crime." *Escalera*, 361 F.at 743 (internal quotation marks omitted). The plaintiff claims that Ms. Anderson's allegations concerning the plaintiff's conduct could not give rise to probable cause that he had committed a crime. I disagree. The plaintiff was arrested for an alleged breach of peace in violation of Conn. Gen. Stat. § 53a-181. (*See* ECF No. 27-5, Ex. B, Affidavit of Selwyn Sebourne ("Sebourne Aff.") at ¶ 8 (noting that the plaintiff was arrested for "2nd degree Breach of Peace, in violation of 53a-181").) That statute provides in relevant part as follows:

> (a) A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or such other person's property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public and hazardous or physically offensive condition by any act which such person is not licensed or privileged to do. For purposes of this section, "public place" means any area that is used or held out for use by the public whether owned or operated by public or private interests.

Conn. Gen. Stat. § 53a-181. The plaintiff's actions, as represented by Ms. Anderson and Ms. Formato, could satisfy the first or fifth prong of this statute. With regard to the latter, the plaintiff was accused of using various curse words directed toward Ms. Anderson in public. He was also accused of telling Ms. Anderson –in an "escalated" tone and a "loud voice[],"  (Anderson Stmt. at 2; Formato Stmt. at 1)—that she "need[ed] to get the fuck back in [her]

12

house." (Anderson Stmt. at 3.) A reasonable police officer could interpret this statement as a threat and Ms. Anderson alleged that she took it as such, noting that she became "fearful" at this point. (*Id.* at 4; *see also* Formato Stmt. at 2 (Formato noting that she "felt a bit stressed and nervous" and hurried her children inside the house).)

The plaintiff contends that such statements—even if he had uttered them—would have constituted protected speech under the First Amendment. (*See* ECF No. 28 at 5 (citing *State v. Baccala*, 326 Conn. 232, 256 (2017) (reversing defendant's conviction under Conn. Gen. Stat. § 53a-181(a)(5) for using obscene language in an abusive manner on basis of the First Amendment).) This argument is misguided. First, *Baccala*—which was decided after the events giving rise to this lawsuit and thus could not have informed the defendants' understanding of the law—is distinct from the present case. *Baccala* concerned a belligerent, disabled forty year old woman who shouted obscene insults at a store manager in charge of handling customer service duties at a supermarket. *See id.* at 235. Here, as noted above, Ms. Anderson wrote in her statement that, during her conversation with the plaintiff, "his tone of voice escalated and he replied with, 'well if you don't know anything then *you need to get the fuck back in your house*.'" (Anderson Stmt. at 2 (emphasis added).) Ms. Formato noted that she heard "loud voices but couldn't make out the words." (Formato Stmt. at 1.) This evidence suggests that the plaintiff threatened Ms. Anderson or, at the very least, instructed her to retreat while she was on her own property, causing her to become "fearful." (Anderson Stmt. at 3). Further, the plaintiff's alleged statement—which Anderson told Officer Sebourne was delivered in an "escalated" tone—would have had the same effect had the obscenity been dropped. By contrast, in *Baccala*, the obscene language—and whether it amounted to "fighting words"—was the focus of the court's analysis and there was no indication that the assailant did anything to threaten the

employee. Another meaningful difference between this case and *Baccala* is that the obscene language in the latter was directed at a store manager in charge of customer service who was on duty at the supermarket. *Baccala*, 326 Conn. at 253. The *Baccala* court relied in part on the argument that the manager had "a degree of control over the premises where the confrontation took place" and, given her experience in customer service, should be used to "disappointed, frustrated customers who express themselves in angry terms . . . ." *Id.* None of these observations apply to Ms. Anderson who was standing in her yard in the midst of a rapidly unfolding custody dispute. As such, *Baccala* does not provide useful guidance in the present case.

Even if it did, as noted above, the plaintiff's behavior fell under both Conn. Gen. Stat. §§ 53a-181(a)(5) *and § 53a-181(a)(1)*. Thus, even if the First Amendment did somehow vitiate Officer Sebourne's probable cause to arrest the plaintiff for a violation of the former provision, it did not affect his probable cause determination concerning the latter provision. *See Virginia v. Black*, 538 U.S. 343, 359 (2003) (holding First Amendment does not protect "true threats," which "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"). Finally, even if the issue of probable cause were a jump ball, the defendants would still be entitled to judgment as a matter of law given the doctrine of qualified immunity. *See Martinez*, 202 F.3d at 634 (holding that officers need only establish "arguable probable cause" to be entitled to qualified immunity (internal quotation marks omitted).)

I therefore conclude that Officer Sebourne had probable cause to arrest the plaintiff for breach of peace. In light of this disposition, Officer McClain also had probable cause to arrest him based upon Officer Sebourne's probable cause determination. *See Panetta v. Crowley*, 460

14

F.3d 388, 395 (2d Cir. 2006) ("When making a probable cause determination, police officers are entitled to rely on the allegations of fellow police officers." (internal quotation marks omitted).) The defendants' motion for summary judgment is therefore granted with respect to the plaintiff's false arrest claim.

B.  **Malicious Prosecution Claim**

"Once a plaintiff presents a claim of malicious prosecution under § 1983, the court must engage in two inquiries: whether the defendant's conduct was tortious; and whether the plaintiff's injuries were caused by the deprivation of liberty guaranteed by the Fourth Amendment." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995). A court must look to the law of the forum state to adjudicate a malicious prosecution claim. *Niemann v. Whalen*, 911 F. Supp. 656, 669 (S.D.N.Y. 1996) (looking to New York state law standard in adjudicating malicious prosecution claim under § 1983). To set out a cause of action for malicious prosecution under Connecticut state law, a plaintiff must prove "want of probable cause, malice and a termination of suit in the plaintiff's favor." *Vandersluis v. Weil*, 176 Conn. 353, 356 (1978). My previous disposition that Officer Sebourne had probable cause to arrest the plaintiff for breach of peace dooms the plaintiff's malicious prosecution claim. *See Bhatia v. Debek*, 287 Conn. 397, 411 (2008) ("The existence of probable cause is an absolute protection against an action for malicious prosecution . . . ." (internal quotation marks omitted)).

I therefore grant the defendants' motion for summary judgment with respect to the plaintiff's malicious prosecution claim.

V.  **Conclusion**

For the reasons set forth above, the defendants' motion for summary judgment (ECF No. 27) is hereby GRANTED.

15

IT IS SO ORDERED.

                                      /s/
                            Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
                 September 25, 2018